A09A1631. GREENWOOD HOMES, INC. et al. v. REGIONS BANK.
(692 SE2d 42)

MILLER, Chief Judge.

Greenwood Homes, Inc. ("Greenwood"), Chris K. Beaty, and C. M. Beaty (collectively, "Appellants") appeal from the trial court's order approving an application ("Application") by Regions Bank ("Regions") under OCGA § 44-14-161 for confirmation of a nonjudicial foreclosure sale of property. Appellants contend that, in valuing the property, Regions' appraiser used an inherently flawed "investment valuation" methodology which entailed improper deductions and also erroneously relied on distress sales as comparable sales. Given such flaws, Appellants claim that Regions failed to present any evidence establishing the property's true market value. Since the trial court's confirmation order was supported by the

---

competent valuation testimony of Regions' appraiser, we affirm.

> Value on the date of sale is a factual question to be resolved by the trier of fact. In a proceeding for confirmation of a foreclosure sale of real property, the judge sits as a trier of fact, and his findings and conclusions have the effect of a jury verdict. Where the trial judge, sitting as the trier of the facts, hears the evidence, his finding based upon conflicting evidence is analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it.

(Punctuation and footnote omitted.) *Trefren v. Freedom Bank of Ga.,* 300 Ga. App. 112, 113 (684 SE2d 144) (2009).

The record shows that on April 30, 2007, Greenwood executed a promissory note in Regions' favor in the original principal amount of $2,316,225 in connection with a loan to fund the acquisition and development of seventeen townhome lots in the Westchase Glen subdivision in Fulton County ("the Property"). On the same date, Greenwood executed a deed to secure debt and security agreement granting Regions a security interest in the Property. The Beatys apparently agreed to guarantee Greenwood's indebtedness to Regions.

On July 11, 2008, Regions notified Appellants that they were in default of their payment obligations and accelerated and declared due the remaining principal balance of $693,596.80 under the promissory note. Earlier in the month, Regions had retained Kenneth Cantrell, an MAI-designated commercial appraiser, to value the Property, and Cantrell provided Regions with his detailed written appraisal (the "Appraisal") on July 22, 2008, concluding that the Property's market value was $509,600.[1]

Regions offered the Property for sale at public auction on September 2, 2008. Regions, the sole bidder, purchased the Property at auction for $509,600. Subsequently, Regions filed its Application, and the trial court held a hearing on the same, during which Cantrell and Appellants' expert appraiser, Mit Bradford, among others, testified. In addition to explaining his valuation methodology in detail, Cantrell testified that his valuation as of July 2008 remained accurate as of the date of the foreclosure sale. Following the hearing, the trial court issued its order finding that the price Regions bid "represented the true market value of the Property . . ." and grant-

---

[1] At the time of the Appraisal, the 17 lots comprising the Property were partially developed, in that roads, curbing, gutters, and underground utilities were in place, but no concrete foundations for the townhomes had been laid.

ing Regions' Application.

1. Appellants maintain that, in arriving at the Property's value, Cantrell used an inherently flawed "investment valuation" methodology which entailed improper deductions. We disagree.

(a) *Cantrell's methodology*. In order to confirm a foreclosure sale, the trial court must be "satisfied that the property so sold brought its true market value. True market value is the price that the property will bring when it is offered for sale by one who is not obligated, but has the desire to sell it, and is bought by one who wishes to buy it, but is not under a necessity to do so." (Citations and punctuation omitted.) *Cartersville Developers v. Ga. Bank & Trust*, 292 Ga. App. 375, 377 (664 SE2d 783) (2008); see also OCGA § 44-14-161 (b). Contrary to Appellants' arguments, nothing in Cantrell's Appraisal or testimony indicates that he evaluated the "investment value" of the Property as opposed to its true market value.[2] Cantrell's Appraisal states that its purpose "is to provide the current 'As Is' market value of [the Property] as of July 21, 2008," and, consistent with OCGA § 44-14-161, defines "[m]arket value . . . as the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."

Cantrell explained that he used a "sales comparison approach" and "discounted cash flow" analysis to ascertain the Property's market value. Cantrell first identified sales of comparable properties in order to determine a "retail value" for the Property. In selecting comparable sales, Cantrell exclusively considered "bulk sale transactions," i.e., those in which groups of townhome lots are sold in one transaction. Cantrell ultimately identified six comparable sales, and after analyzing them, determined that the Property's retail value was $35,000 per lot.

Cantrell then took into account the "absorption rate" for the Property, meaning the pace at which the lots would sell over a period of time. After studying supply and demand for competitive properties, Cantrell determined that market demand for the Property would mature following a twelve-month holding period; nine lots would be sold following the deferment; and the remaining lots would sell in the six-month period thereafter. Given the deferred demand for townhome lots, Cantrell utilized a discounted cash flow analysis to determine the present market value of the Property. Cantrell

---

[2] "Investment value is the value of a property to a particular investor, whereas market value is not related to the needs of individual investors but is objective, impersonal, and detached; investment value is based on subjective, personal parameters." (Citation and punctuation omitted.) *Maryville Properties v. Nelson*, 83 SW3d 608, 617 (Mo. Ct. App. 2002).

applied an 11% discount rate to the expected net proceeds from the sale of the Property and deducted the taxes that would be incurred during the 12-month holding period and thereby determined that the Property's market value was $509,600 ($29,976 per lot).

Notwithstanding that Cantrell's Appraisal and testimony establish that he determined the market value (not the investment value) of the Property, Appellants claim that Cantrell conducted an investment valuation because Cantrell assumed that the lots comprising the Property would be sold in bulk to an investor or builder. Appellants' argument is unpersuasive. On cross-examination, Appellants' counsel asked Cantrell whether a potential purchaser might include a "vulture fund that would want to buy the lots cheap," and Cantrell responded: "Whether the motivation of a buyer is to buy lots cheap or not is not reflected in our market value because market value goes back to the definition that the buyers and sellers are typically motivated and that there is no duress reflected in that market value." Such testimony establishes that Cantrell's analysis was directed at determining a market price for a bulk purchase of the lots in an arms-length transaction.

(b) *Deductions inherent in bulk sales analysis.* Appellants claim that a bulk sales analysis such as that Cantrell conducted does not yield a property's "true market value" in that it allows deductions for costs and expenses that the bulk purchaser expects to incur in developing and reselling the property. As Appellants acknowledge, our prior cases have authorized the use of a bulk sales analysis to determine true market value where, as in this case, multiple lots are pledged as security under a single security deed with a power of sale permitting the bulk sale of the lots. *Fayette Promenade v. Branch Banking &c. Co.*, 258 Ga. App. 323, 324-326 (574 SE2d 319) (2002) (bank expert's bulk sales analysis, which included deductions for items such as real estate commissions, marketing, administration, and risks and profits and a discount for the conversion of funds to present value, was permissible since applicable security deed did not require piecemeal sale of the property); *Marett Properties v. Centerbank Mtg. Co.*, 204 Ga. App. 265, 265-266 (419 SE2d 113) (1992) (mortgage company's expert permissibly used bulk sales analysis to determine fair market value of 26 residential lots).

Here, Cantrell acknowledged that the purchase prices in the bulk purchase transactions he relied on as comparable sales would have factored in the purchaser's expected carrying costs and entrepreneurial profit. Given that the security deed in this case authorized Regions to dispose of the Property in "one or more sales," Cantrell was authorized to begin his valuation process with an analysis of comparable bulk sales transactions, even though the sales prices in those transactions inherently reflected certain deductions a

builder or investor might require.[3] An analysis premised upon comparable bulk sales would appear particularly appropriate in this case in light of Cantrell's testimony that "[i]n all my experience, I have never seen a sale of an individual town home lot, and the reason for that is that town homes aren't built individually. They are built in blocks of 4, 5, 6, 8." Such testimony indicates that, in fact, no market for the Property may have existed apart from the bulk sales market. See *Gutherie v. Ford Equip. Leasing Co.*, 206 Ga. App. 258, 261 (1) (424 SE2d 889) (1992) ("OCGA § 44-14-161 (b) must be read to require proof of true market value *under the usual market conditions* for sales of such property") (emphasis in original).

Appellants suggest that we overrule *Marett Properties* and *Fayette Properties* as inconsistent with OCGA § 44-14-161 (b). This Court recently rejected the same invitation in *Trefren*, supra, 300 Ga. App. at 115-116, and we adhere to our prior decision in *Trefren* here.

(c) *Discounted cash flow analysis*. Appellants also claim that Cantrell's use of a discounted cash flow analysis, which included application of a discount rate and deduction for taxes incurred in the predicted 12-month holding period, is inconsistent with OCGA § 44-14-161 (b). Cantrell testified that it was necessary to apply a discount rate and deduct taxes due to the deferred demand for the Property. Appellants' own expert, Bradford, testified that the real estate market had worsened since the time of Cantrell's Appraisal and that "subdivision lots aren't moving." We have previously held "that in determining true market value, a trial court may consider market conditions in general at the time of the sale under power and the effect of depressed market conditions on the value of a subject property." (Citations omitted.) *Gutherie*, supra, 206 Ga. App. at 260 (1). We also recently held that a trial court did not err in relying on a discounted cash flow analysis to determine the true market value of property sold in a nonjudicial foreclosure sale. *Blue Marlin Dev. v. Branch Banking &c. Co.*, 302 Ga. App. 120 (690 SE2d 252) (2010). Under the circumstances, we see no reason to conclude that Cantrell's use of a discounted cash flow analysis to account for depressed demand in the real estate market was improper.

2. Appellants contend that Cantrell's valuation is unreliable

---

[3] Since such deductions factor directly into the price a willing buyer would pay for the Property, taking them into account does not amount to consideration of issues "collateral" to the Property's true market value. Compare *Wheeler v. Coastal Bank*, 182 Ga. App. 112, 114 (1) (354 SE2d 694) (1987) (evidence of closing costs bank would incur in selling property irrelevant); *First Nat. Bank &c. v. Childress-Ross Properties, Inc.*, 189 Ga. App. 765, 766 (377 SE2d 533) (1989) (extra costs bank would incur in selling foreclosed properties separately were irrelevant when separate sales were required by loan documents).

because two of the six comparable bulk sales Cantrell relied upon in his Appraisal were distress sales. We disagree.

Cantrell's Appraisal indicates one of the comparable sales he relied on was "below market value" and another appeared to be a distress sale. Cantrell adjusted the price upward for those two transactions to account for the fact that they were not sold under regular market conditions, and he placed less weight on them in determining a retail value for the Property. Appellants' own expert testified that he did not have a "beef" with the comparable sales Cantrell selected and agreed with Cantrell's "top level" value of $35,000 a lot. Under the circumstances, we have no basis for concluding that Cantrell's limited consideration of two "non-market" transactions invalidated his valuation.

3. In conclusion, we reject Appellants' contention that Regions failed to present competent valuation evidence supporting the trial court's confirmation order.

The question before us in this appeal is not whether this Court would have found Cantrell or Appellants' expert more reliable and accurate, "but whether the record contains any evidence to support the findings of the trial court that the property brought its true market value at the foreclosure sale." (Citation and punctuation omitted.) *Marett*, supra, 204 Ga. App. at 266. Here, Cantrell explained the basis for his opinion, and his opinion was not based on "sheer speculation." See id. Accordingly, Cantrell's valuation provided evidence supporting the trial court's conclusion that the true market value of the Property was equivalent to the price Regions paid at the foreclosure sale.

For the foregoing reasons, we affirm the trial court's order granting Regions' Application.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED MARCH 3, 2010.

*Schreeder, Wheeler & Flint, John A. Christy, Philip R. Green*, for appellants.

*Greenberg Traurig, Jennifer B. Moore, Michael J. C. Shaw*, for appellee.